**ZEHRING et al. v. BROWN MATERIALS, Limited, et al.**

**No. 151 Civil.**

District Court, S. D. California, N. D.

Jan. 19, 1943.

742

David Sokol, of Los Angeles, Cal., and David E. Peckinpah and L. N. Barber, both of Fresno, Cal., for plaintiffs.

Swaffield, Swaffield & Madden, by Joseph E. Madden, all of Long Beach, Cal., and James T. Barstow, of Fresno, Cal., for defendants.

HALL, District Judge.

The plaintiffs seek overtime wages, penalties, attorneys' fees and costs under the Fair Labor Standards Act of 1938, 29 U.S. C.A. § 201 et seq.

During the period of their employment they worked on the repair of tractors, drag lines, concrete mixing trucks, dipper sticks, dump trucks and other similar paraphernalia and equipment owned or operated by the defendant.

The defendant's business was described by its President as material dealer. It sold building materials such as rock, sand, cement, lime, brick, and similar things to the general public from its several yards or warehouses. It also sold rotary mud, which is sold only for use in drilling operations of oil wells. The defendant did excavating work and general contracting, such as excavating and grading public and private roads, levees, irrigation ditches and the like, but did no building construction. And while the defendant sold ready mixed concrete, it did not do any concrete construction work.

All of the material sold by plaintiff was used or consumed by the purchaser at the place where it was delivered by the defendant. None of it was sold for resale, or resold.

About 5% of defendant's gross business during the past three years (the period of plaintiff's employment) was the sale of drilling mud. And about 2% was the excavating and grading of private roads for oil companies in the Kettleman Hills, Belridge, or adjacent oil fields. The "biggest percentage" of defendant's business was "shovel and drag line work * * * building levees, and trying to control the storms and things of that nature."

No record was kept by the defendant (or the plaintiffs) of the time spent by any of the plaintiffs on each repair job, nor the work that was being done by the particular piece of machinery at the time of repair, i. e., whether the machinery was hauling materials for a road, an oil company, or a private house, for instance.

The plaintiffs claim that they are entitled to the additional wages and penalties because, assert the plaintiffs, they were employees engaged "in commerce," and "in the production of goods for commerce."

The defendant, denying this, also claims it is exempt under the provisions of Section 13(a) of the Act as a "retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

There are three elements to this exemption. The business must be "retail" (or "service"); it must be an "establishment;" and the greater part of that establishment's selling or servicing must be, "in intra-state commerce."

■ Generally speaking, a wholesaler is one who sells to another for resale, who in turn is a retailer in that he sells the object or article or thing to the person who consumes or uses it.

The prefix "re-" means "again," so that "re-tail" originally meant "tell-again." But usage now also accords the general meaning to be "sell-again." The essential distinction then between a wholesaler and a retailer is that the person buying from a retailer is the ultimate user or consumer of the article or commodity and does not sell it "again;" whereas, the one buying from a wholesaler buys only for the purpose of selling the article "again," in which event he is a retailer, or if he buys an ingredient or a part to produce goods for sale, he is not a retailer, but under the Act is a "producer of goods" Sec. 3(i), (j).

■ The defendant having sold its materials to those who consumed or used them, and who did not buy them to sell again was thus a retailer.

■ It operated from three offices or warehouses where it kept its materials stored. At one of them it had the repair shop. Hence, it must be regarded that it operated from an "establishment," as distinguished from a travelling salesman or a mere broker.

Were its sales "in intra-state commerce"?

It is necessary, here, to determine the meaning of this phrase as used in the Act.

No limitation is placed in the Constitution on what "commerce" is to be regulated by Congress, except the power to regulate commerce "among the several States." Article 1, § 8, cl. 3.

■ It was thought by John Marshall that this meant any commerce which "concerns more states than one."[1] But judicial interpretation of various acts from time to time seemed to narrow that concept to things which *moved* across state lines, or instrumentalities used in moving them. Later, this concept was broadened so as to include things which had an *"effect"* on the commerce which moved across state lines or the things which moved that commerce, but, with this limitation, the "effect" had to be real and immediate and not "remote." With the decisions, however, upholding the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.,[2] the concept of the Constitutional grant again broadened to what its contemporary John Marshall had thought it meant.

It was in this "climate of opinion"[3] that the Congress enacted the law here involved, and the Supreme Court sustained its constitutionality,[4] and interpreted its scope.[5]

■ The Act in Section 3(b) uses the identical language of the Constitution, in defining "commerce," saying it "means * * * commerce * * * among the several States," thus giving rise to the

[1] Gibbons v. Ogden, 9 Wheat. 1, 194, 6 L.Ed. 23.

[2] National Labor Relations Board v. Jones & Laughlin Steel Corp. (and related cases), 1936, 301 U.S. 1, et seq., 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[3] Keifer etc., v. Reconstruction Finance Corp., 1939, 306 U.S. 381, 391, 59 S.Ct. 516, 519, 83 L.Ed. 784.

[4] United States v. Darby, 1940, 312 U. S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Opp Cotton Mills v. Administrator, 1940, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624.

[5] Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 63 S.Ct. 125, 87 L.Ed. ——, Nov. 9, 1942.

question as to whether or not Congress did not intend to legislate "coextensive with the limits of the power of Congress over commerce."[6] But the Supreme Court, taking their cue from the rest of the Act, and from "the context of the history of federal absorption of governmental authority over industrial enterprise,"[7] has held otherwise. And it must be regarded as settled that the Act is not as broad in its regulation of commerce as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., or the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.[8] And that the commerce—the interstate commerce—aimed at by the Fair Labor Standards Act is that commerce which moves across state lines, including the production of goods which normally are intended or expected to move across state lines, and necessary instrumentalities of movement, and not commerce which does not move or is normally not intended to move *across* state lines, even though it might affect or concern commerce among the states.[9]

■ The phrase "*in* intrastate commerce" hence, as used in this Act must mean commerce which *does not move,* or is normally not intended to move, across state lines.

■ None of the goods or materials sold by the defendant were "in" interstate commerce in the sense that they moved in inter-state commerce or travelled across state lines, or were produced or sold with that intention.

` .It must be concluded that the selling end of defendant's business was that of a retail establishment, the greater part of whose sales were in intra-state commerce.

That determination does not dispose of what the defendant described as the greater portion of its business, namely, the dragline work upon excavations, levees, and "trying to control the floods and storms" in Tulare lake and work of that nature. The question arises whether or not that is the business of a "service establishment."

Before deciding that question, consideration must be had as to whether or not the plaintiffs as employees of the defendant were engaged in commerce or produced

goods for commerce, because if the defendant is not thus liable under the Act, it is immaterial whether or not that portion of his business was a service establishment.

■ The burden is upon the Petitioners to prove that they were engaged in the production of goods within the meaning of the Act, and that such production was for interstate commerce.[10]

Goods under the Act means "goods, * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof." Sec. 3(i).

■ It was evidently intended by Congress, judging from their language and not from any "divination" of which the plaintiff's counsel speaks, that "goods," as used in Sections 6 and 7 of the Act meant things which could be created or made, or the materials or ingredients for such things. Now, an irrigation ditch or a levee for an irrigation ditch (unless it were navigable, or directly connected with navigable waters) is strictly a local concern. It is not a thing which can be shipped in commerce or transported across state lines, nor is it a thing upon which other things can be moved in commerce among the States or across state lines. So, whether the building of levees and irrigation ditches to control the floods in Tulare Lake, is the business of a service establishment or not, it seems not to have been within the contemplation of Congress when it prescribed the maximum hours and minimum wages for the production of goods for commerce.

■ Nor did the defendant by such action become "engaged in commerce," as contemplated by Sections 6 and 7 of the Act so as to cover the plaintiffs. Commerce is defined by Section 3(b) of the Act to mean "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Obviously, drag line work in digging levees and irrigation ditches for a purely local irrigation project is not transportation, transmission, or communication among the several states or from any state to any place

**6** Kirschbaum Co. v. Walling, supra, 316 U.S. page 523, 62 S.Ct. page 1120, 86 L. Ed. 1638.

**7** Kirschbaum Co v. Walling, supra, 316 U.S. page 523, 62 S.Ct. page 1120, 86 L. Ed. 1638.

**8** Kirschbaum Co. v. Walling, supra.

**9** United States v. Darby, supra.

**10** Warren-Bradshaw Drilling Co. **v.** Hall, 63 S.Ct. 125, 87 L.Ed. ——, Nov. 9, 1942.

outside thereof. An examination of the many cases not only of the Supreme but of the intermediate and state courts as to what has been meant by the word "trade" in various acts of Congress and the word "commerce" in the Constitution and various Acts of Congress does not lead me to the conclusion that such drag line and levee building could be considered either trade or commerce among the states. Of course, there is no doubt that drag line work and levee building would be comprehended within those definitions as affecting such trade or commerce if such work were done on any interstate boundary or between various states or on navigable waters, or as indicated by the definition of the Act on any transportation or communication system between states.

It remains to be determined whether or not the plaintiffs are entitled to the benefit of the Act, because they worked on the repair of trucks and general equipment used for the purpose of hauling mud to oil wells and excavating and grading roads to oil wells and for the purpose of delivering rock and sand to roads.

As to the latter, no evidence was introduced as to what roads the defendant worked on, that is whether or not they were part of the National Highway System furnished with Federal funds, or purely local roads. It was conceded that deliveries of goods were made to the State Highway Department of California, as well as to various municipal corporations for the purpose of building roads.

But there is no evidence from which any conclusion could be drawn that these roads were part of the transportation system between the states, unless every road is to be considered such. Nor is there anything to plaintiff's point in this connection that the defendant was a wholesaler because it delivered rock and sand on the road which was processed by some other person and that the driving public was the consumer. The goods were consumed when they were laid in the road. The ultimate user was the State of California or the municipal corporation which built the road, owned it, paid for it, and kept it in repair.

The plaintiff's theory in respect to the drilling mud is that oil is a commodity of interstate commerce (with this, I must agree;) that the defendant sold drilling mud which was necessary or convenient in the drilling of wells; that the use of the trucks of the defendant was necessary to haul the mud to the well; that the services of the plaintiff were necessary to keep the trucks moving, and hence they were engaged in a process or occupation necessary to the production of the oil which ultimately was "goods" in commerce among the states. The same theory is advanced in connection with the grading and excavating of roads, the excavating, grading, of drill sites for oil derricks and oil companies in the oil fields.

The situation is not comparable to that recently considered by the Circuit Court for the 9th Circuit.[11] In that case the restaurant employees were held to be a necessary part of the production of goods for commerce *by* the *employer company.* The company, itself, produced the goods for commerce, whereas, in this case, this defendant does not produce any goods for commerce. Rather, the instant situation falls within what the Court indicated in that opinion not to be subject to the Act. The Court said: *"The retail or service establishment exempted by the Act* is not one which is part of the production of goods for commerce, or a link in a chain to that end, but more precisely *an establishment, probably independent, devoted to serving the public generally, the lesser part of its business being in interstate and the greater intrastate* commerce." (Italics supplied)

If all of defendant's business or any substantial portion of it consisted of the selling of rotary mud or the excavating and grading of roads for oil companies, then, I think that the plaintiffs would be in a different position. But, as heretofore pointed out, the total of these two items during the past three years, according to the only evidence in the record on that subject, was but 7% of defendant's gross business. I cannot agree with plaintiff's contention that if the defendant produced any goods for commerce among the states, that his entire business takes on that character and subjects him to the terms of the Act. Nor with plaintiff's contention that if they did *any* work on *any* truck which hauled *any* mud to an oil well, they must be considered as employees engaged in the production of goods in interstate commerce, as to their whole time. If Congress intended the Act to

---

11 Womack v. Consolidated Timber Co., 9 Cir., 132 F.2d 101, Dec. 7, 1942.

apply to only employees who were engaged in the production of goods for commerce, then a sensible interpretation must be given to the Act, and it is not reasonable that where 7% of the defendant's business might be considered to be necessary or convenient to the production of goods for commerce, he should have an interstate character given to the other 93% of his business.[12]

There is nothing in the Act which compels the defendant under the facts in this case to pay the wages prescribed by the Act to persons producing goods in interstate commerce. But on the other hand there is nothing to prevent the defendant in this case from voluntarily making the scale of pay and time coincide with the standard laid down in that Act. In fact, it is quite within the realm of possibility that Congress, while legislating only in the restricted area of goods produced for interstate commerce or the ingredients of those goods, considered the probability that such higher wages and shorter hours would attract workers to that type of industry, and that the law of supply and demand would compel those who are exempt from the provisions of the Act, or who do not come within its terms, to meet the scale of pay and periods of work.

Judgment will be for the defendant.

Let Findings of Fact and Conclusions of Law be drawn accordingly.

[12] United States v. Darby, supra, 312 U.S. page 118, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.