Per Curiam:
This case was referred to Trial Commis *414 sioner James F. Davis with, directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a) [since September 1,1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on December 5,1968. Exceptions to the commissioner’s findings of fact and recommended conclusion of law were filed by plaintiff. Defendant requested that the court adopt the commissioner’s opinion and findings of fact with a single requested modification in the opinion. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
Commissioner Davis’ opinion, as modified by the court, is as follows:
Plaintiff seeks to recover part of the excise taxes it paid for 1960 as a manufacturer of fishing reels.[1] Plaintiff was subject to tax under section 4161 of the Internal Revenue Code of 1954 at the rate of 10% of the price for which it sold its reels. Plaintiff sold reels bearing its “Shakespeare” trademark to volume purchasers at discounts of 51-to-55% off list, depending on quantity purchased. It offered the same price terms to all its customers. Most of plaintiff’s customers were retailers. Some, however, were distributors who resold to retailers. Plaintiff also sold private-brand reels to several customers who in turn resold under their own trademarks. One such customer was South Bend Tackle Company (hereafter “South Bend”), to whom plaintiff sold reels, substantially identical to “Shakespeare” reels, at 70% off list price of comparable “Shakespeare” models.
The issue is whether plaintiff is entitled under section *415 4216(b) (2) of the 1954 Code[2] to compute its tax liability for “Shakespeare” reels on the price for which it sold private-brand reels to South Bend. In a word, section 4216(b) (2) for the period in suit provided a special constructive sales price rule for manufacturers (otherwise qualifying for its use) who sold to retailers and one or more wholesalers. The rule is that the manufacturer’s excise tax on a taxable article is computed on the lesser of (1) the actual selling price of the article or (2) the highest price for which such article is sold by the manufacturer to wholesale distributors. Plaintiff says it has met all conditions necessary for application of section 4216 (b) (2) and the proper constructive sales price for “Shakespeare” reels is 70% off list.
The Commissioner of Internal Revenue (hereafter “Commissioner”) computed plaintiff’s tax liability for “Shakespeare” reels on basis of prices equivalent to 51-to-55% off list.[3] Defendant contends this was correct because some of plaintiff’s purchasers of “Shakespeare” reels at 51-to-55% off list (those who resold to retailers) were “wholesale distributors” and that the sales prices to them therefore established the “highest price” for which such articles were sold by plaintiff “to wholesale distributors,” within the meaning of the statute.
. Plaintiff, on the other hand, contends that because it sold “Shakespeare” reels to all its customers on equal price terms and at a maximum 55% discount off list, all its sales were *416 in effect sales “to retailers”; and therefore South Bend was its sole “wholesale distributor.” Plaintiff contends further that the normal method of sales of fishing tackle in the industry is not to sell at retail or to retailers; that sales to South Bend were arm’s-length transactions; and that “Shakespeare” and “South Bend” reels are identical articles for purposes of section 4216 (b) (2).
For reasons discussed below, it is held that plaintiff is not entitled to recover because its price of 51-to-55% off list is, for purposes of the statute, “the highest price * * * to wholesale distributors”; and therefore its tax liability for “Shakespeare” reels was properly computed by the Commissioner. It is unnecessary to discuss other issues, save one, which, as noted below, defendant raises at the threshold.

The statute

Section 4216(b) (2) was added to the 1954 Code by the Excise Tax Technical Changes Act of 1958 (hereafter “Changes Act”) to supplement what is now section 4216(b) (1) (then 4216(b)). By way of background, manufacturers excise taxes from their inception in 1932 were intended to apply as a percentage of the price at which manufacturers sold to volume purchasers, traditionally at the wholesaler level. Congress early recognized, however, that competitive inequities were created among manufacturers of like goods who sold at different levels of distribution. E.g., a manufacturer which sold at retail rathen than to wholesalers charged a higher price for its goods because of increased expenses of distribution at retail. Thus the excise tax paid was accordingly higher, in effect penalizing the manufacturer for its method of distribution. To correct this, Congress enacted section 4216(b) (present 4216(b) (1)) which provides, among other things, a constructive sales price for manufacturers who sell at retail. In essence, the Commissioner is authorized to compute the tax on basis of a constructive sales price which is the price for which such articles are sold “in the ordinary course of trade by manufacturers or producers thereof.” Generally, the effect of section 4216(b) (present 4216(b) (1)) is to lower the tax base on goods sold by manufacturers at retail.
Section 4216 (b), however, did not include a like provision *417 for manufacturers who sold to retailers. Many manufacturers considered this an. inequity since sales to retailers, like sales at retail, entail higher costs due to increased distribution expenses. At hearings preceding enactment of the Changes Act, there was considerable testimony, and a number of proposed solutions, presented by manufacturers. Generally, the proposals would have amended section 4216(b) to include sales “to retailers,” as well as sales “at retail”; or would have eliminated expenses of distribution to retailers from the tax-base price. It was pointed out, however, that any amendment to section 4216 (b) which required the Commissioner to determine prices of manufacturers in the ordinary course of trade, or costs of distribution to retailers, would create an undue administrative burden on the Internal Revenue Service. Congress therefore rejected such proposals and, instead, enacted section 4216(b) (2) which requires no administrative determination by the Commissioner of either manufacturer’s price in the ordinary course of trade or manufacturer’s costs of distribution to retailers or at retail. Rather, section 4216(b) (2) provides for determining tax-base price on basis of the particular sales practices of the manufacturer seeking to invoke the section.[4]
In connection with the Technical Changes Act of 1958, supra, the Ways and Means Committee acknowledged that because of significant administrative problems it would be difficult to achieve uniformity of base for purposes of the manufacturers excise taxes. For this reason, no attempt was made in the bill to fully achieve this goal. (H. Rep. No. 481, 85th Cong., 1st Sess., p. 21 (1958-3 Cum. Bull. 372,392)). See similar statement in the Senate Finance Committee report (S. Rep. No. 2090, 85th Cong., 2d Sess., p. 22 (1958-3 Cum. Bull. 584, 605)).
By its terms, section 4216 (b) (2) requires, among other *418 things, that a manufacturer sell at retail or to retailers, and also to one or more wholesalers, in arm’s-length transactions. If this condition is met, the inquiry then focuses on the highest price at which the manufacturer sells to wholesalers. If lower than the price at retail or to retailers, it becomes the constructive price upon which sales at retail or to retailers is based. In this way, the tax-base price is lowered to reflect more nearly the purpose of Congress to eliminate therefrom distribution costs to retailers or at retail.

Normal method of industry sales

One condition of section 4216(b) (2) is that the normal method by which manufacturers in an industry sell taxable articles must be other than at retail or to retailers. The reason for this is that Congress felt there is no substantial discrimination in tax burden among manufacturers in an industry where most sales are to retailers or at retail. Thus, only where a manufacturer sells at retail or to retailers, in an industry predominantly selling to wholesalers or jobbers, is section 4216(b) (2) intended to apply.
As a threshold argument, defendant says plaintiff has failed to prove that most manufacturers of fishing reels in 1960 sold their products other than at retail or to retailers. Plaintiff, on the other hand, says it has proved that in 1960 most fishing tackle manufacturers sold to wholesalers. The evidence supports plaintiff. While it is admittedly difficult to prove industry selling practices, due to paucity of published information and reluctance of most manufacturers to disclose customer lists and sales practices, plaintiff has come up with trade association statistics for 1960 which are probative and reliable. (Finding 7(a).) Testimony of witnesses familiar with the fishing taclde industry in 1960 corroborate the statistics. Defendant offered no contrary evidence. Under the circumstances, therefore, plaintiff has carried its burden of proof on this point.[5]
*419 Sales of “Shakespeare” reels to “wholesalers”
Defendant’s principal argument, and one deemed disposi-tive here, is that plaintiff sold “Shakespeare” reels to wholesale distributors, as well as retailers, at 51-to-55% off list; and therefore such price is the “highest price” for which such articles were sold by the manufacturer “to wholesale distributors,” within the meaning of section 4216(b) (2). Thus, defendant considers it immaterial that plaintiff sold comparable reels to South Bend at a lower wholesale price since it is the highest, not the lowest, wholesale price which governs application of section 4216(b)(2). The evidence supports defendant and shows that, notwithstanding its sales policy of equal terms to all customers, plaintiff sold “Shakespeare” reels at 51-to-55% off list to distributors who warehoused them and sold them through catalogs and outside salesmen to retailers on a regular basis and at markups comparable to other goods.
Plaintiff says such sales were not “wholesale transactions” because the price charged was the same as the price to retailers; and that it is unrealistic and contrary to the intent and purpose of section 4216 (b) (2) to consider a manufacturer’s price to retailers also to be its highest price to wholesale distributors. Neither the statute and its legislative history nor the regulations support this view. The regulations[6] define “wholesale distributors” as “persons who customarily resell to others who in turn resell,” a definition consistent with pertinent case law. See West Kentucky Coal Co. v. Walling, 153 F. 2d 582, 585 (6th Cir. 1946); Zehring v. Brown Materials, 48 F. Supp. 740, 743 (S.D. Cal. 1943). Several of plaintiff’s customers fit this well-established definition. Furthermore, wholesale price has been defined as the price which a retailer pays in expectation of obtaining a higher price by way of profit from the ultimate consumer. Guess v. Montague, 51 F. Supp. 61, 65 (E.D. S.C. 1942). The record shows that despite plaintiff’s selling policy, some wholesalers bought “Shakespeare” reels and resold them to *420 retailers, similarly to other goods, to realize their usual profit.[7]
With respect to the purpose of the statute, plaintiff admittedly made most of its sales of “Shakespeare” reels to retailers. Thus, to the extent that plaintiff’s price of 51-to-55% off list includes costs of distribution to retailers, congressional purpose of section 4216(b) (2) is not realized to the fullest extent. However, as above noted, Congress considered, but rejected, proposed legislation which would have directly eliminated costs of distribution to retailers from the tax-base price, and Congress also recognized that it was not attempting to achieve fully the goal of complete conformity. While Congress may have hoped section 4216 (b) (2) would normally reach the same result, its plain meaning, as applied to the facts here, 'fails to do so. Courts are powerless to rewrite tax statutes, however appealing it may be. F. W. Fitch Co. v. United States, 323 U.S. 582 (1945); Helvering v. Rebsamen Motors, Inc., 128 F. 2d 584 (8th Cir. 1942).
Plaintiff further says that even if it sold “Shakespeare” reels to wholesale distributors, the sales were de mmimis and should be ignored. It is not clear from the record what quantity of “Shakespeare” reels passed through distributors to retailers. The evidence shows that at least four of plaintiff’s customers were wholesale distributors who resold plaintiff’s “Shakespeare” reels to retailers in their ordinary course of doing business. There is also evidence that about 20 of plaintiff’s other customers were considered in the trade to be jobbers. To what extent such jobbers resold “Shakespeare” reels to retailers is not clear. It is a fair assumption, however, based on evidence of sales practices of plaintiff’s above-noted four customers, that some jobbers resold “Shakespeare” reels to retailers in their ordinary course of business. In any event, the statute does not require sales to wholesalers to be large in quantity. Eather, the legislative history indicates that Congress intended sales to even one wholesaler, if regularly made, to be sufficient to establish a wholesale price.[8]
*421 Finally, plaintiff says it is discriminated against vis-a-vis its competitors if it is not permitted to lower its tax base for “Shakespeare” reels to 70% off list. The record shows that in 1960 plaintiff’s major competitors sold their name-brand reels primarily to wholesalers at about 60-to-65% off list. However, there is no evidence that plaintiff and its competitors set equal list prices on 'comparable goods, and thus no real way to compare tax bases and therefore excise tax paid. Thus, what plaintiff seeks is not an end to discrimination but a lowering of its tax base below its competitors by using as a constru-tive price its lowest, not highest, price to wholesale distributors. Congress intended no such result in the operation of section 4216 (b) (2).
A final point: Defendant says name-brand “Shakespeare” reels and private-brand “South Bend” reels, albeit physically similar, are different articles for purposes of section 4216(b) (2); and thus in no event can plaintiff’s price to South Bend be the constructive price on which to tax sales of “Shakespeare” reels. In essence, defendant’s argument is that, because of reduced selling and advertising costs, plaintiff’s price to South Bend was lower than any contemplated by Congress as a constructive “wholesale” price for name-brand goods.
This argument need not be discussed in detail. However, it is noted that the evidence shows that plaintiff realized significant savings in advertising, distributing and packaging costs by selling reels as private-brand merchandise to South Bend rather than as “Shakespeare” reels. (See finding 6.) In view of Fitch Co. v. United States, supra, which holds that advertising and selling costs must be included in the excise tax base; and in view of section 4216(a), 1954 Code, which says that packaging expenses must be included in the price base, there is doubt whether Congress, under the facts here, intended section 4216(b) (2) to operate to reduce the tax base on name-brand merchandise to the price level of private-brand merchandise. The legislative history is not clear on this point, although the question of tax treatment of private-brand merchandise was noted generally during hearings on the Changes Act. See Excise Tax Technical and Administrative Problems, Hearings Before a Subcomm. *422 of the House Oornm. on Ways amd Means, 84th Cong., 1st Sess., at 248, 397 (1955).
In sum, it is held that section 4216(b) (2) here applies; that plaintiff sold “Shakespeare” reels to wholesale distributors, its highest price being 51-to-55% off list; and that, therefore, the excise tax on “Shakespeare” reels was properly based on the sale price 51-to-55% off list.
FiNdings op Fact
1. Plaintiff, Shakespeare Company, is a Michigan corporation, with its principal office in Kalamazoo, Michigan. Plaintiff manufactures and sells fishing reels which are subject to the manufacturer’s excise tax under section 4161 of the Internal Revenue Code of 1954.
2. On February 12,1965, the District Director of Internal Revenue, Detroit, Michigan, asserted against plaintiff an assessment of $433,920.85, plus interest of $69,805.27, for additional excise taxes on the sale of fishing reels for the period October 1, 1960 through September 30, 1963. On February 23,1965, plaintiff paid $20,497.44, representing the assessment for the last quarter oí 1960 (October 1, 1960 through December 31, 1960), the tax period in suit. On March 18, 1965, plaintiff filed a claim for refund of such tax paid, plus interest. The petition in this court was timely filed on December 29,1965.
3. From 1959 to 1963, plaintiff sold its fishing reels to about 5,500 customers. It sold reels under its own trademark “Shakespeare,” and also to private-brand customers who in turn resold under their own trademarks. Plaintiff, by its own estimate, accounts for about 20% of the fishing reels sold in the United States. In the fourth quarter of 1960, the tax period here in issue, plaintiff made and sold 63 different models of reels under its trademark “Shakespeare” to about 4,000 customers. Sales for that quarter of both “Shakespeare” and private-brand reels amounted to $673,974.07, of which about 15% were private-brand sales to South Bend Tackle Company, Inc. (hereafter “South Bend”), a company independent of and not affiliated with plaintiff. Included in sales for the tax period in question were the following:
*423 Purchaser Private- “Shakespeare”- Total brand reels brand reels
Sears, Roebuck & Co..-. $48,785.11 $4,901.46 $53,686.56
Montgomery Ward Co..-. 9,935.89 10,882.11 20,817.98
South Bend Tackle Co., Inc. 95,468.21 None 95,468.21
Total-154,189.21 15,783.56 169,972.75
4. (a) During the period in issue, plaintiff employed 26 full-time commissioned salesmen (and three sales trainees), located throughout the United States, who concentrated on selling plaintiff’s “Shakespeare”-brand products to retail outlets. Plaintiff’s products were, however, sold to any business demonstrating an ability to pay. Plaintiff’s salesmen and officers, though familiar with the general nature of its customers and their businesses, maintained no records regarding the specific distribution methods used by its customers.
Except for the six firms noted in finding 10, there is no evidence how plaintiff’s customers further distributed the “Shakespeare” reels purchased from plaintiff, i.e., whether sold to retailers or directly to consumers. Though some of plaintiff’s officers testified that 98% of plaintiff’s sales of “Shakespeare” reels were to retailers, there is no evidence, based on plaintiff’s customer list for the period in issue, either (a) that 98% of plaintiff’s customers sold directly to consumers or (b) that 98% of the reels sold to plaintiff’s customers were in turn resold directly to consumers.
(b) Plaintiff maintained a warehouse from which it shipped orders for “Shakespeare” reels received from customers; advertised its products in numerous publications, including catalogs and magazines directed principally to consumers, and brochures directed principally to retail dealers ; and, during the Christmas season, offered a special sales promotion program especially intended to appeal to retail dealers.
5. Except as noted in the following paragraph, plaintiff sold “Shakespeare” reels to its customers at a maximum discount of 50-10% (equivalent to 55%) off a suggested retail list price. Thus, an article having a suggested retail list price of $10 would be sold for $4.50 ($10 x 50%=$5 discount; $5 x 10%=$0.50 discoimt). Plaintiff’s terms were the same *424 to all customers, whether they engaged in retail or wholesale operations, or both. To qualify for plaintiff’s 50-10% discount, a customer had to either (a) place an order for merchandise costing $2,250 (listing for $5,000), or (b) purchase that amount of merchandise in the preceding year. If the customer did not so qualify, it would receive either a 50-2%, 50-4%, 50-6%, or 50-8% discount (51%, 52%, 53%, or 54%, respectively), depending on the volume of merchandise purchased. Except for a 2% discount for prompt payment, plaintiff offered no additional discounts, such as early-order discounts, free transportation, free merchandise, or cooperative advertising to its customers.
Plaintiff made sales of “Shakespeare” reels at 60-to-70% off list totaling $2,199.15 during the period in suit to various customers and to its salesmen. Such sales were either promotional items for the Christmas season, were for salesmen’s personal use or sales samples, or were items of discontinued models.
6. (a) In addition to sales of reels under its own trademark “Shakespeare,” plaintiff sold reels to private-brand customers, including South Bend. South Bend then resold such reels under its “South Bend” trademark. The manufacture and sale of private-brand merchandise was common in the fishing tackle industry in 1960. Plaintiff sold reels to South Bend at a price negotiated at arm’s-length between the parties and determined without regard to any tax benefits under chapter 32 of the Internal Revenue Code of 1954. The price to South Bend was equivalent to about 70% off the list price of comparable “Shakespeare” reels. South Bend resold the reels strictly to jobbers and distributors, generally at a discount of 50-10% (55%) or 50-10-10% (59.5%) off a suggested retail list price. At times, other incentive discounts were given. South Bend, in addition to buying reels from plaintiff, acquired them by import and from Fishing Tackle Products Company, a domestic manufacturer owned by the same family as owned South Bend.
(b) The reels which plaintiff manufactured for South Bend were functionally identical and physically similar to models which plaintiff sold under its own “Shakespeare” trademark. Both reels were manufactured on the same as *425 sembly line, and substantially all of the materials and parts were interchangeable, though their outward appearance was different, e.g., colors and minor nonfunctional decorative features. On at least one reel model sold to South Bend, the handle construction and exterior finish differed from its “Shakespeare” counterpart. There is no evidence to what extent such differences affect reel function, life or manufacturing cost. Neels made for South Bend were impressed with the trademark “South Bend” during the manufacturing operation. All reels which plaintiff sold under its “Shakespeare” trademark were offered by plaintiff to South Bend as private-brand reels. South Bend bought about 22 of plaintiff’s 63 models in 1960.
(c) In selling to private-brand customers, including South Bend, plaintiff required minimum orders of $10,000 for any one fishing reel model. Plaintiff would accept orders for less, but added a $250 set-up charge. Generally, the customer was required to place its order 15 months in advance of shipment and to furnish plaintiff with reel boxes and instruction folders 30 days prior to production. South Bend’s practice was to order reels from plaintiff based on anticipated sales and then withdraw reels from plaintiff’s warehouse when it received orders from its own customers. Plaintiff packed reels for South Bend in bulk containers of 100 to 200 reels. Before resale, South Bend repackaged the reels in individual cartons bearing South Bend’s trademark and other identifying indicia.
Plaintiff’s average cost of bulk-packaging “South Bend” reels was 1.23 cents per reel. Its average cost of packaging “Shakespeare” reels in individual cartons was 10.81 cents per reel. Had plaintiff packaged “South Bend” reels in individual cartons prior to sale to South Bend, its selling price would have increased about 2.2%.
(d) Besides sales to South Bend, plaintiff sold private-brand reels to others including Sears, Roebuck & Company and Montgomery Ward Company. (Finding 3.) There is no evidence regarding (i) the nature of the reels sold to private-brand customers other than South Bend or (ii) whether the prices for which sold were based on list prices of “Shakespeare”-brand reels.
*426 7. (a) To show the method of distribution of fishing tackle in the industry, plaintiff put in evidence statistics collected by the American Fishing Tackle Manufacturers Association (hereafter “AFTMA”) whose membership in 1960 comprised about 120 of the about 3,000 companies which manufactured or imported fishing tackle. AFTMA estimates that its membership accounts for about 65 percent of all fishing tackle sales in this country. Members of the AFTMA independently prepare and voluntarily submit sales data to the AFTMA, which retains accountants who compile the information so furnished. The AFTMA does not instruct, advise or check with the participating members on how they determine whether their customers are wholesalers, department stores, chain stores, dealers, or other outlets, each manufacturer or importer having to make that classification for itself. Statistics compiled for the year 1960 show that 95 AFTMA members reported 64.8 percent of their collective fishing tackle sales were to organizations which they considered to be wholesalers.
William G. Balz, plaintiff’s executive vice president; Andrew J. Boehm, executive director, AFTMA; and Marvin Shutt, executive director, National Sporting Goods Association, all of whom were experienced and knowledgeable about the sporting goods industry, testified that most fishing tackle sales by manufacturers in 1960 were made to wholesale distributors, thus corroborating the statistics of the AFTMA.
(b) In the fishing tackle industry in 1960, there were few wholesale distributors who simply purchased in bulk from manufacturers, stored their purchases in a warehouse, and sold them in smaller lots in arm’s-length transactions exclusively to retail dealers through outside salesmen, catalogs, and other promotional materials. Bather, many buyers of fishing reels from manufacturers maintained both wholesale and retail operations. In some cases, wholesalers operated their own retail stores, either directly or through subsidiary corporations. In others, wholesalers sold merchandise to independent but franchised retail dealers, in which case the dealers were usually offered preferential buying terms. Often, however, wholesalers who sold through captive or *427 franchised retail stores also solicited business from unrelated retailers through salesmen, catalogs and the like.
Generally, wholesalers’ markup on sporting goods in 1960 to unrelated retail dealers was about 9-25%. Markup was often less to retailers associated in some way with a wholesaler and varied according to the selling and distribution functions performed by the wholesaler and retailer, respectively. A detailed description of sales practices of six of plaintiff’s customers in 1960 is set out in finding 10.
8. (a) Plaintiff considered Garcia Company (hereafter “Garcia”) and Zebco division of Brunswick Corporation (hereafter “Zebco”) its largest competitors in 1960. Garcia and Zebco accounted for about 15-20% of all fishing reel sales in the United States during the period in issue and, together with plaintiff, accounted for 85-40% of such sales,
Zebco based its prices to its customers on discounts from suggested retail list prices. About two-thirds of Zebco’s sales were to wholesalers and about 10-15% to retail dealers. Zebco’s basic sale price of reels to its customers was 50-10% off a suggested retail list price. However, Zebco offered additional discounts for large-quantity purchases, or for specific items such as combination rods and reels, including free merchandise, early-order discounts, and freight allowances, which typically amounted to overall discounts of 60-to-65% off the suggested retail list price. The maximum discount ever offered by Zebco in the period in question was 50-10-20-21-2-2% (equivalent to about 72%), which discount was applied to one specific item, not to everything sold by Zebco. Zebco did not offer functional discounts, i.e., special or additional discounts to those of its customers who were wholesalers.
Garcia sold its products in the same manner as Zebco and at comparable discounts off suggested retail list prices. Garcia sold principally to wholesalers and chain stores.
(b) Andrew J. Boehm, executive director of AFTMA, testified that to his knowledge the discount to wholesalers by fishing reel manufacturers during the period in issue was generally 50-10-10% (equivalent to 57.5%) off a suggested retail list price. The maximum was 50-10-10-10% (equivalent to about 63.6%). Further discounts, including freight *428 allowances and early-order discounts, may have at times been given by some manufacturers.
9. In the fishing tackle industry in 1960, suggested retail list prices of articles including fishing reels were independently set by each manufacturer or importer. There is no evidence from which to compare the suggested retail list prices established by manufacturers on comparable fishing reels, except for certain “Shakespeare” models and their “South Bend” counterparts. “Shakespeare” reels listed at the same or higher prices than comparable “South Bend” models. In general, retailers sold reels other than “Shakespeare” reels to consumers at a price between list price and 40-to-50% off list. Retailers sold “Shakespeare” reels between list price and about 33-to-40% off list.
10. Representatives of six of plaintiff’s customers testified at trial.
(a) Ace Hardware Company (hereafter “Ace”), Chicago, Illinois, in 1960 sold a complete line of hard-goods merchandise to 450 franchised, independently owned retail hardware dealers. Ace did not sell goods at retail, except occasionally to accommodate its employees. Ace maintained a warehouse in which it stored goods bought from manufacturers for resale to its retail dealers at 9% markup. About one-half its sales were made by drop shipment, in which case Ace reduced its markup from 9% to 2i%. The drop-shipment procedure worked as follows: Ace furnished its retail dealers with Ace Hardware Company order forms which the dealers then used to order directly from a manufacturer. Ace was billed for the merchandise but shipment was made directly to the retail dealer. Ace paid the manufacturer; and Ace, in turn, billed the retail dealer, adding 2% to the manufacturer’s price. Ace was principally liable to the manufacturer for merchandise so purchased.
Generally, large orders of retail dealers were filled by drop shipment from manufacturers, while smaller orders were filled from the Ace warehouse. Ace was a customer of plaintiff during the period in issue, as well as a customer of Zebco and Garcia. Ace applied its 9% or 2% markup on plaintiff’s merchandise as well as on the other goods it handled. However, because of plaintiff’s pricing policy, Ace *429 encouraged its retail dealers to purchase plaintiff’s products by drop shipment, thereby to make the dealers more competitive in the marketplace with retailers who purchased directly from plaintiff. Ace warehoused certain of plaintiff’s products, although not in depth, because of demand from time-to-time for such items by retail dealers. Plaintiff’s goods which were warehoused by Ace were sold at 9% markup. During the tax period in issue, Ace purchased from plaintiff $1,724.15 worth of products, at 50-10% discount from plaintiff’s suggested retail list price. There is no evidence what portion of such products was sold by drop shipment and what portion was sold through Ace’s warehouse. Ace purchased products from Zebco and Garcia at about 66-to-67 % off the suggested retail list price.
(b) Maurice Sporting Goods, Inc. (hereafter “Maurice”), Chicago, Illinois, in 1960 purchased sporting goods from manufacturers for resale to retail dealers, department stores and the like. Maurice maintained a warehouse in which it stored goods, including products of plaintiff and of Zebco and Garcia. Maurice owned a retail store, Kelly Sporting Goods, in Chicago, through which it merchandised about 3% of its goods between mid-1960 and mid-1961. In 1960, Maurice sold all its goods, including plaintiff’s goods, to retailers at its own cost plus a 12% markup. Maurice’s sales of plaintiff’s goods during the period in issue amounted to $575.45. Maurice purchased plaintiff’s goods in 1960 at 50-10% discount off plaintiff’s suggested retail list price. It also purchased goods from Zebco and Garcia basically at a like discount; but further discounts in the form of free goods increased the effective discount to about 50-10-20% (64%).
(c) Faber Brothers, Inc. (hereafter “Faber”), Chicago, Illinois, in 1960 sold sporting goods to retail dealers in a five-state area of the midwest. Faber sold through salesmen and by catalog which listed several of plaintiff’s models of fishing reels. Faber sold to its customer dealers at two different price levels. To members of a group called “Favorite Stores,” Faber sold goods at 10% above cost. To other dealers, Faber sold at 40% off the manufacturer’s suggested retail list price. Any retail store could join the Faber group and become a “Favorite Store” by paying Faber $600. “Favorite *430 Stores” paid freight on all orders, received no discounts from Faber for prompt payment, and could not return merchandise purchased. Other retail store customers of Faber received a 2% discount for prompt payment, paid no freight charges, and could return merchandise.
Faber purchased plaintiff’s goods at a discount of 50-10% off plaintiff’s suggested retail list price; and Zebco’s and Garcia’s goods at a discount of 50-10-22% (about 65%) off suggested retail list price. Its markup on all fishing-reel items to its retail dealer customers was as above noted. Faber bought reels from plaintiff, during the period in issue, amounting to $67.77. Faber owned no retail outlets and made no sales at retail.
(d) Jack Esses Distributing Company (hereafter “Esses”), St. Louis, Missouri, in 1960 distributed general merchandise including sporting goods. Esses maintained a warehouse with a showroom, employed no outside salesmen, and sold to retail dealers including sporting goods stores, industrial customers, government agencies, and jobbers. A few retail sales were made to consumers who came to the showroom. About half of its sales were to retail dealers.
Esses bought plaintiff’s goods during the period in issue at 50-10% discount off plaintiff’s suggested retail list price and sold them to its customers at generally 40-to-50% off such price. Esses bought Zebco and Garcia products at 50-10% discount off the suggested retail list price, plus other incentive discounts including free goods. Such products were sold at generally 40-to-50% off suggested retail list price. Its profit on plaintiff’s goods was usually between 5% and 25% of the list price, and on Zebco and Garcia goods, between 15% and 25% of the list price. During the period in suit, Esses purchased goods from plaintiff amounting to $593.18.
(e) Sutcliffe Company (hereafter “Sutcliffe”), Louisville, Kentucky, in 1960 operated a wholesale sporting goods business in a multi-state area. It also operated a retail store in Louisville. Sutcliffe employed 17 salesmen who solicited orders from retail dealers and 5 salesmen who solicited orders from educational institutions. Sutcliffe published and circulated a catalog listing its products and prices. During the tax period in issue. Sutcliffe bought fishing tackle products *431 from plaintiff and other manufacturers including Zebco and Garcia. It bought plaintiff’s goods at a discount of 50-10% off plaintiff’s suggested retail list price, and Zebco’s and Garcia’s goods at about 65% off the manufacturer’s suggested retail list price. Generally, Sutcliffe resold its fishing tackle products to retailers at 40%, 40-5% (43%), or 40-10% (47%) off the manufacturer’s suggested retail list price.
In 1960, Sutcliffe’s purchases from plaintiff totaled $18,000. Its purchases of fishing tackle products from all manufacturers in that year totaled $1,075,000. It sold about $31,000 of its fishing tackle products through its retail store, about 18% ($5,600) of which were plaintiff’s products. The balance ($12,400) of plaintiff’s products was sold to independent retailers.
(f) Honus-Wagner Company (hereafter “Wagner”), Pittsburgh, Pennsylvania, in 1960 was a retail sporting goods store, wholly owned by E. L. Braunstein Company (hereafter “Braunstein”), a wholesale dealer. Braunstein purchased goods from manufacturers and in turn sold them to retail dealers or through its wholly owned retail outlet, Wagner. Braunstein added a 10% markup to the products it sold through Wagner. About 85'% of Braunstein’s distribution was through Wagner, about 15% through other retail dealer customers.
Braunstein bought plaintiff’s products, in amount of $640.95, at 50-10% discount off plaintiff’s suggested retail list price and, in 1960, sold them only through Wagner. Braun-stein bought Garcia’s reels at 60-to-65% off the suggested retail list price. Wagner sold plaintiff’s reels at retail at 33%% discount off the suggested retail list price and sold Garcia’s reels at 45-to-50% discount off the suggested retail list price. Wagner was not permitted to purchase goods directly from manufacturers. All purchasing was done by Braunstein, although orders for plaintiff’s fishing reels were written by Wagner personnel on E. L. Braunstein Company order forms.
11. At trial, various witnesses identified 20 of plaintiff’s customers (in addition to the customers described in finding 10) as being generally in the sporting goods wholesale or jobber business. Such customers are below listed, along with *432 their purchases of “Shakespeare” reels from plaintiff for the period in issue:

Company Purchases

X S. Oskman Co., Houston, Texas_$11,682.98
Stem Distribution Co., Cleveland, Ohio_ 6, 393.11
Younkin Sports Supply, Inc., Tampa, Florida_ 4,927.64
Belkn'ap Hardware & Manufacturing Co., Louisville, Kentucky_ 2,196.21
Leonard Melton Co., Nashville, Tennessee_ 1,641. 68
Harrison Wholesale Co., Chicago, Illinois_ 1,669.36
Gilbert Sporting Goods Distributor, Inc., Cincinnati, Ohio_ 1,274.18
Markwort Sporting Goods, St. Louis, Missouri_ 1, 020. 36
Central Sales Corp., Milwaukee, Wisconsin_ 604.44
Walthour & Hood Co., Atlanta, Georgia- 606. 63
Roberts, Sanford and Taylor Co., Sherman, Texas_ 696.22
NuWay Sporting Goods Co., Sioux City, Iowa_ 382.05
Stratton & Terstegge Co., Louisville, Kentucky- 144. 84
Peeler Hardware Co., Macon, Georgia--- 66.30
H. L. Peters, Inc., Buffalo, New York- 64.91
Robinson Company, Atlanta, Georgia_ 62.48
C. M. MeClung Company, Nashville, Tennessee- 42. 74
Gunning Wholesale, Inc., Wichita, Kansas- 31. 77
Sullivan Hardware Co., Greenville, South Carolina_ 25.70
J. A. Williams Company, Pittsburgh, Pennsylvania_ 16.44
The evidence is not clear how the above-listed companies fupther marketed plaintiff’s “Shakespeare” reels, i.e., by *433 sale to other jobbers, to related or unrelated retailers, or to ultimate consumers.
12. None of the additional excise taxes assessed by defendant in this case were included in plaintiff’s sales price of the reels with respect to which taxes were imposed, and plaintiff has not collected the tax or a portion thereof from the purchasers of the reels.
Ultima.™ FiNDings or Fact
13. Plaintiff manufactured and regularly sold “Shakespeare”-brand reels to retailers in arm’s-length transactions at 51-to-55% off list price. It did not sell to ultimate consumers.
14. Plaintiff regularly sold “Shakespeare”-brand reels at 51-to-55% off list price in arm’s-length transactions to buyers who were wholesale distributors of general hardware and sporting goods merchandise. Some of such distributors in turn resold the reels to independent retailers at the same markup as on other goods.[1]
15. Plaintiff regularly sold private-brand reels to South Bend Tackle Company for resale by South Bend under the “South Bend” trademark. “South Bend” reels made by plaintiff were functionally identical and physically similar to corresponding models of “Shakespeare”-brand reels. Plaintiff’s price to South Bend was equivalent to about 70% off list of the corresponding “Shakespeare” model. Plaintiff’s sales were arm’s-length transactions and the price was determined without regard to any tax benefits under chapter 32 of the 1954 Code. Plaintiff made no sales of “Shakespeare”-brand reels to South Bend.
16. The normal method of sales of fishing tackle by manufacturers in 1960 was not to sell to retailers or at retail.
CONCLUSION or Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 The Internal Revenue Service asserted a deficiency against plaintiff of $433,920.85, plus $69,805.27 interest, for additional excise taxes for the period October 1, 1960 through September 30, 1963. Plaintiff paid $20,497.44, for the period October 1, 1960 through December 31, 1960, and sues here for refund.

 See. 4216 * * *
(b) 'CONSTRUCTIVE SALE PRICE.-
(2) special rule. — If aii article is sold at retail * * * [or] to a retailer * * * and if—
(A) tlie manufacturer, producer, or importer of such article regularly sells such articles at retail [or] to retailers * * * as the case may be,
(B) the manufacturer, producer, or importer of such article regularly sells such articles to one or more wholesale distributors * * * in arm’s length transactions and he establishes that his prices in such cases are determined without regard to any tax benefit under this paragraph,
(C) the normal method of sales for such articles within the industry is not to sell such articles at retail or to retailers, or combinations thereof, and
(D) the transaction is an arm’s length transaction,
the tar under this chapter shall (if based on the price for which the article is sold) be computed on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold by such manufacturer, producer, or importer to wholesale distributors * * *.

 There is no issue here regarding the price on which plaintiff’s sales to South Bend should be taxed. Defendant agrees that the actual selling price, i.e.j about 70% off list, is the proper base.

 Taxpayer cites a number of cases wbieii involved only Section 4216(b) (1), not Section 4216(b) (2). See Power Brake Equipment Co. v. United States, 22 A.F.T. R. 2d 6147 (D. Ore. 1968, on appeal to the Court of Appeals for tbe Ninth Circuit); E. Albrecht & Son v. Landy, 114 F. 2d 202 (8th Cir. 1940); Boise National Leasing, Inc. v. United States, 389 F. 2d 633 (9th Cir. 1968); Quaker City Iron Works, Inc. v. United States, 256 F. Supp. 450 (E.D. Pa. 1966). Section 4216(b)(1) contains the different concept of “the price for which such articles are sold, in the ordinary course of trade, by manufacturers and producers thereof”. As Indicated in the text, this concept plays no role in Section 4216(b) (2).

 The legislative history of § 4216(b) (2) shows that Congress Intended the section to apply only when half or more of the sales of manufacturers In an industry were sales to other than retailers or at retail. See H.R. Rep. No. 481, 85th Cong., 2d Sess. (1958-3 Cum. Bull. 372, 394).
Later, Congress recognized the difficulty of proving industry distribution practices; and in 1962, it amended § 4216(b) (2) to obviate this requirement, except for certain industries not including the fishing tackle industry.

 Temporary Treas. Regs., 26 C.F.R. § 148.1-5(4) (1) (1960), under the Excise Tax Technical Changes Act of 1958, 72 Stat. 1275.

 This can no doubt be explained by the fact that some retailers in 1960 sold to consumers at or near list price. Therefore, a wholesaler, buying from plaintiff at 55% off list, could resell to a retailer at 10-25% markup and the retailer could in turn resell to a consumer at a fair profit.

 H.R. Rep. No. 481, 85th Cong., 2d Sess., supra (1958-3 Cum. Bull. 394) ; S. Rep. No. 2090, 85th Cong., 2d Sess. (1958-3 Cum. Bull. 584, 607).

 This finding is not based to any extent on the Sporting Goods Jobbers’ Register 1960-1.