SEMINOLE ROCK AND SAND COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32645. Promulgated November 18, 1952.

*Stanley Worth, Esq.*, for the petitioner.
*Newman A. Townsend, Jr., Esq.*, for the respondent.

TIETJENS, *Judge:* Petitioner asks a redetermination of a deficiency in income tax for 1943 of $21,500.37.

Two issues are presented for decision: (1) Was the allocation to petitioner of a portion of the gross income and deductions of Pratt, Lassiter & Watkins, a partnership, proper; and (2) was petitioner entitled to a claimed deduction for loss due to abandonment of an asphalt plant.

#### FINDINGS OF FACT.

The petitioner (hereinafter called the taxpayer) is a Florida corporation, organized in 1933, with its headquarters in Miami, Florida, immediately south of the International Airport. During 1943 it was

engaged in the wholesale rock and sand business, obtaining its products through dredging operations. During part of that year it also operated an asphalt plant. Its books are kept, and its 1943 return was filed, on the accrual and calendar year basis.

*Issue No. 1.*

In January 1942, a partnership was formed known as Pratt, Lassiter & Watkins (hereinafter called the partnership). The partners were Dr. Joseph Hyde Pratt, a mineralogist and former geologist for the North Carolina Geological Survey; R. G. Lassiter, a graduate mining engineer with many years of mining experience; and Joel H. Watkins, an eminent mining geologist. Dr. Pratt died in June 1942. Thereafter, the partnership under the old name was continued by Lassiter and Watkins, Lassiter having a 95 per cent interest and Watkins 5 per cent. The purpose and business of the partnership was to engage in mining, metallurgical, civil, mechanical, electrical, and efficiency engineering and to make surveys of plants, properties, etc., and to advise other businesses; also to hire such engineers as are employed by clients, with their consent, as of January 1, 1942. The principal office of the partnership was at Raleigh, North Carolina.

The partnership employed an imposing staff of qualified engineers and geologists. Richard T. Lassiter, a graduate of Massachusetts Institute of Technology in civil engineering, and a cousin of R. G. Lassiter, was employed to take charge as general manager. Said general manager had supervision over the books and records kept by the partnership, and kept detailed records of the time, place, and character of the work performed by the various members of the staff. He also made the assignments of work, and, in association with Watkins, rendered the bills to the clients of the partnership. Such billings were made at arm's length on the basis of time, expenses, and results accomplished. The charges were reasonable.

During the taxable year the partnership was employed by other concerns than the taxpayer, among them four concerns in which Lassiter owned the controlling interest. By far, most of the partnership business was with the Lassiter controlled corporations.

In 1943 the taxpayer had need of services of the character offered by the partnership. These services were furnished to the taxpayer by the partnership pursuant to a written agreement entered into in June 1942 similar to those customarily made between engineering and management advisory firms and clients. Prior to the formation of the partnership the taxpayer had its own staff of engineers and mining experts. But for the services furnished by the partnership, the taxpayer would again have had to employ its own engineers and geologists or engage the services of other consultants. Most of the

engineers and geologists employed by the partnership had previously been employed directly by corporations and businesses controlled by Lassiter, including the taxpayer.

The taxpayer and the partnership were separately existing and functioning organizations, but were controlled by Lassiter. The partnership earned the fees received by it from the taxpayer. Allocation of part of the partnership's income to the taxpayer as proposed by the Commissioner was arbitrary and unreasonable.

## Issue No. 2.

During a portion of 1943, up to and including September, the taxpayer owned and operated an asphalt plant. It sustained an operating loss from such operations of $2,471.93. Before the close of 1943 the asphalt plant was dismantled by the taxpayer and the dismantled parts were moved to vacant land which it owned. The plant was so constructed that it could be taken down, moved, and re-erected at another location. As dismantled, the plant was in such condition that it could be either re-erected or sold. At the time of such removal the petitioner had definitely determined not to rebuild the asphalt plant or to go back into the asphalt business. Had the petitioner intended to continue in the asphalt business, it would first have selected a new site, built the foundations, and removed the dismantled plant and re-erected it as one operation. This was not done. The dismantled plant was sold in April 1944 for approximately $16,000 and re-erected by the purchaser at an undisclosed time on the site where it originally stood. The cost to the taxpayer of dismantling and removing the plant did not exceed $2,000.

At the date the plant was taken down it had a depreciated cost of $50,070.73, from which the taxpayer substracted an estimated salvage value of $16,000 and claimed the balance of $34,070.73 as an abandonment loss in its 1943 return as part of a deduction of $83,362.48. The deficiency notice shows the disallowance of the entire amount of $83,362.48.

Early in 1943 the United States Government, through its Army engineers, instituted condemnation proceedings against the petitioner to condemn the land comprising the location of its plant in Miami for the purpose of expanding the International Airport which adjoined the taxpayer's property on the north. The condemnation proceeding was settled by the conveyance to the Government, by deed, of certain tracts of land totalling about 90 acres, for a stated consideration of $39,400 and the granting of an avigation easement for a term of 15 years, for a stated consideration of $65,000. The land covered by the easement comprised about 35 acres and included land on which were located the taxpayer's main rock plant, several other structures, and

its asphalt plant. The easement required the taxpayer to remove all structures, and effectively foreclosed the use of the 35 acres for the term of the easement. The $65,000 payment covered, among other things, the expense of moving the taxpayer's crusher plant, asphalt plant, and railroad.

The petitioner effectively and completely abandoned its asphalt plant during the year 1943.

OPINION.

*Issue No. 1.*

In the statement accompanying the deficiency notice the adjustments involved in the first issue were explained simply as "Adjustments of income and deductions from partnership of Pratt, Lassiter & Watkins." No mention is made of section 45, Internal Revenue Code.[1] Nor is the application of that section mentioned in the pleadings in this case. For the first time in his opening statement and again on brief counsel for the Commissioner makes clear his position that the allocation to the taxpayer of a portion of the gross income and deductions of the partnership "was necessary to clearly reflect the income of" the taxpayer in 1943. Thus the Commissioner relies squarely on his broad powers under section 45 as authority for his action. He places no reliance and bases no argument on section 22 (a). It is doubtful that the application of section 45 can thus properly be invoked. *Commissioner* v. *Chelsea Products, Inc.*, 197 F. 2d 620, affirming 16 T. C. 840; *Palm Beach Aero Corporation*, 17 T. C. 1169.

This issue need not be disposed of on that ground. In his argument the Commissioner recognizes the existence of the partnership as a legal entity but contends "businesswise that partnership was a sham." We cannot agree. Prior to the formation of the partnership the businesses in which Lassiter held a controlling interest each had need of engineering, mining, and geological services. These services were furnished by a separate staff of experts attached to each enterprise. After the formation of the partnership these specialized services were centralized in the new organization, which in a sense was a service organization for the Lassiter businesses, but which was not necessarily confined in its activities to those businesses. Thus a larger staff of experts was assembled and coordinated in one office than there-

[1] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

tofore existed in any one of the separate enterprises. This could certainly result in some business advantage (though its monetary measure does not appear in the record) to the Lassiter businesses in making for greater flexibility in meeting the varying needs for such services of each company.

We think this case is governed by the principles applied in *Buffalo Meter Co.*, 10 T. C. 83; *Seminole Flavor Co.*, 4 T. C. 1215; and *Palm Beach Aero Corporation*, *supra*. Here, as in those cases, business reasons existed for forming the partnership. It was not a sham. It operated as a separate entity, albeit the services it performed for the Lassiter enterprises might still have been performed had each enterprise continued to employ its own staff of experts in the engineering and geological field. Under the revised set up, however, it was the partnership that actually performed the services and earned the income which the Commissioner seeks to tax to the taxpayer.

The Commissioner argues that the fees charged taxpayer were unreasonable and that this was a device for syphoning off the taxpayer's earnings to the partnership. But it is evident that the unreasonableness of the fees was not the real basis of the Commissioner's action. Certainly the services rendered by the partnership were not valueless. There was uncontroverted testimony elicited at the hearing that the contract under which the services were performed was the customary form of contract for engineering services, that the billings were made at arm's length on the basis of time, expenses, and results accomplished, and we are satisfied there was no spurious overcharging by the partnership. Nevertheless, the Commissioner's proposed allocation would take away *all* of the partnership income and tax it to the partnership's clients. If this reallocation was really based on the unreasonableness of the fees it would seem that the partnership should have been left with at least some of the income which it received for its services.

We think the actual basis for the Commissioner's action was his theory that the partnership was a sham. We cannot accept that theory. On this record we perceive no reasonable basis on which the Commissioner could properly call the broad provisions of section 45 into play and his action in doing so was arbitrary and unreasonable.

*Issue No. 2.*

On the abandonment issue, section 23 (f) of the Internal Revenue Code permits a corporation to deduct losses sustained during the taxable year which are not compensated for by insurance or otherwise. Section 29.23 (e)–3, Regulations 111, provides that the difference between the adjusted basis and the salvage value of the property may be deducted as a loss when through some change in business conditions the usefulness of the property in the business is suddenly

terminated so that the taxpayer discontinues the business or discards the property permanently from use in the business.

The fact of abandonment is to be established by the intention of the taxpayer to abandon coupled with an act of abandonment, "both of which must be ascertained from all of the surrounding facts and circumstances." *Boston Elevated Railway Co.*, 16 T. C. 1084, affd. (C. A. 1) 196 F. 2d 923.

Here, in the taxable year, the taxpayer was engaged in the wholesale rock and sand business. During part of the year it also operated an asphalt plant in which operation it sustained an operating loss. Before the close of the year the taxpayer had determined to get out of the asphalt business because it was a losing proposition. Furthermore, the taxpayer was required to dismantle the asphalt plant by virtue of settlement of the condemnation proceedings started by the Government. This dismantling was accomplished in such a manner that the plant could have been reassembled, but that the taxpayer itself had no intention of putting the plant to further use in the business is shown by the fact that had it so intended, another site would have been selected and prepared prior to the dismantling. This was not done. We think there is sufficient evidence to establish abandonment of the plant and we hold that taxpayer is entitled to deduct the difference between the adjusted basis of the asphalt plant and its salvage value.

*Decision will be entered under Rule 50.*