Abbott Mortgage Company, Petitioner v. Commissioner.
Abbott Mortg. Co. v. Commissioner
Docket No. 62243.
United States Tax Court
T.C. Memo 1958-106; 1958 Tax Ct. Memo LEXIS 120; 17 T.C.M. (CCH) 542; T.C.M. (RIA) 58106; June 9, 1958
Sidney B. Gambill, Esq., Union Trust Building, Pittsburgh, Pa., for the petitioner. Gerald Backer, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax of petitioner: 1952
$11,756.77
1953
12,216.27
1954
9,556.62
Two questions are presented for decision: (1) whether *121 the Commissioner properly allocated to petitioner income and deductions which were reported and claimed by J. D. Abbott Company for the years in question; and (2) whether gains from the sale of certain real estate in the years 1953 and 1954 constituted capital gains or ordinary income. Findings of Fact The stipulated facts are so found and the stipulation together with the pertinent exhibits are included herein by this reference. Petitioner is a Pennsylvania corporation incorporated on October 27, 1944. Its income tax returns for the taxable years were filed with the director of internal revenue for the 23rd collection district at Pittsburgh, Pennsylvania. J. D. Abbott owned and controlled petitioner at all material times. In 1938 J. D. Abbott had formed another corporation, J. D. Abbott Company (sometimes hereafter called the original corporation) which he owned and controlled. This corporation was organized for the purpose of engaging in the mortgage brokerage and real estate business. The incorporator's only interest in the real estate business had been to induce builders who could not afford to buy land on their own, to do business with the corporation so the corporation *122 might profit from selling resulting mortgages. J. D. Abbott Company was completely liquidated and dissolved on June 29, 1944. J. D. Abbott individually received all of its assets and assumed all of its liabilities. The original corporation had been organized for the purpose of handling FHA guaranteed mortgages. However, the FHA would not consider any mortgages unless submitted to it through mortgagees approved by it. The corporation had not and could not become an approved mortgagee through which FHA guaranteed mortgages could be handled. Generally an approved mortgagee as defined by the FHA is a company having as its principal activity the lending or the investment of funds under its own control in real estate mortgages, and having sound capital funds of a value of not less than $100,000. Only an approved mortgagee may submit an application to the FHA. After the application is processed and approved, a commitment is issued to the approved mortgagee and the sponsor named in the application. No commitment will be issued to other than an approved mortgagee. The commitment issued by the FHA is to the effect that the FHA will eventually issue an insurance policy with respect to the *123 mortgage and gives the mortgagor 90 days in which to arrange for construction funds and start construction. Potter Bank and Trust Company (hereafter called Potter), a Pittsburgh, Pennsylvania bank, was an FHA approved mortgagee and that bank acted as an approved mortgagee with respect to all mortgages originated and sold by the original corporation prior to its dissolution. All such mortgages were paid for by the "permanent investors" (this term is explained below) by checks payable to Potter. The mortgage premiums represented in those proceeds less the charges made by Potter for acting as an approved mortgagee were credited by Potter to the original corporation. Potter, in consideration for acting as an FHA approved mortgagee, received varying fees dependent on the economic circumstances of the money market. Neither the original corporation nor Potter serviced mortgages which had been originated and sold by the corporation. Servicing a mortgage is making collection of the monthly installments, paying taxes, keeping insurance in force, keeping records, and answering any questions that the investors may have regarding their mortgages. The work is largely done by clerks operating *124 bookkeeping machines. (The term "permanent investor" refers to those savings banks and insurance companies which acquire mortgages as permanent long-term investments.) For this servicing, the permanent investors pay certain percentages calculated on the outstanding balances of the mortgages. In June 1942 the original corporation entered into an agreement with Provident Trust Company (hereafter called Provident), a Pittsburgh bank, which was also an FHA approved mortgagee, to service all mortgages which the corporation was able to have transferred to that bank for servicing. This agreement was for a term of three years. When the original corporation was liquidated and dissolved on June 29, 1944, the business theretofore carried on by it was taken over and operated by J. D. Abbott as an individual. In the liquidation and dissolution he received the agreement between the original corporation and Provident and thus became entitled to receive 40 per cent of the servicing charges collected by Provident. Abbott continued to carry on this business as an individual until February 25, 1946, at which time another Pennsylvania corporation, having the same name as the original corporation, *125 J. D. Abbott Company, was incorporated for the purpose of taking over the mortgage brokerage business theretofore carried on by the original corporation and by Abbott as an individual. That corporation is still in existence and J. D. Abbott has always owned and controlled it. The business of this corporation has been identical with the business which was carried on by the original corporation and by Abbott operating as an individual. Each received and reported all profits and losses from the sales of mortgages. Potter acted as the FHA approved mortgagee with respect to all mortgages originated and sold by the original corporation and by Abbott operating as an individual, and Provident did the servicing with respect to those mortgages. All mortgages sold by both were paid for by the permanent investors by checks payable to Potter. The mortgage premiums represented in those proceeds less the charges made by Potter for acting as an approved mortgagee were credited by Potter to the corporation and to Abbott. J. D. Abbott became interested in organizing his own company which could become an FHA approved mortgagee and could do the servicing for permanent investors - a service which had *126 been done over the years by Provident. The fact that Abbott had no company which could qualify as an FHA approved mortgagee was prejudicing his business with the permanent investors. These permanent investors wanted to acquire mortgages from approved mortgagees who were in position to service the mortgages, "they wanted continuity of service". In the case of delinquencies in the payments on mortgages, taxes, and insurance or in proper maintenance of properties, the permanent investors did not want to look to an outside servicing agent. These considerations prompted the incorporation of the petitioner on October 27, 1944, and the qualification of the petitioner as an approved FHA mortgagee on December 20, 1944. The servicing agreement with Provident required a one year's notice for termination and it was not until May 1946 that servicing operations were commenced by the petitioner. Since then the petitioner has received, retained, and reported 100 per cent of all servicing income received by it. The original J. D. Abbott Company, J. D. Abbott while operating as an individual, and the present J. D. Abbott Company performed all functions in connection with the origination and sales *127 of mortgages. The petitioner most of the time operated only as a servicing agent and has limited its activities to that purpose. J. D. Abbott personally and J. D. Abbott Company have guaranteed about 99 per cent of all obligations incurred by the petitioner since it came into existence. While Potter was acting as an approved mortgagee in connection with mortgages sold by the original J. D. Abbott Company and by J. D. Abbott operating as an individual, the checks from the permanent investors would be received by Potter. Potter would withhold sufficient amounts to pay off the principal of the mortgages (under its "mortgage warehousing" arrangement), deduct its charge for acting as an approved mortgagee (ranging from $10 per mortgage to one-fourth of the premium at which the mortgage had been sold), and pay over the balance of the premium (profit) to J. D. Abbott Company or to J. D. Abbott. After the petitioner was organized and became an approved mortgagee, all checks from permanent investors representing the principal proceeds from the sales of mortgages were paid to the mortgages of record (which were various banks and insurance companies), but the premiums represented in those sales *128 were paid by the permanent investors by separate checks payable to the petitioner and which the petitioner endorsed over to J. D. Abbott Company. These checks were deposited in J. D. Abbott Company's bank account. The books of the J. D. Abbott Company reflect this. During 1952, 1953, and 1954 mortgages were sold to Williamsburg Savings Bank, Peoples Savings Bank of Yonkers, New York Savings Bank, and Sun Life Assurance Co. of Canada. Neither the petitioner nor J. D. Abbott Company were original mortgagees of record in connection with the mortgages sold. The net premiums from the sales of said mortgages were as follows: For the year 1952
$44,403.55
For the year 1953
36,562.75
For the year 1954
42,347.08
The petitioner and J. D. Abbott Company have at all times shared the same offices. The office doors contain the following printed legends: ABBOTT MORTGAGE CO. MORTGAGE CORRESPONDENT SUN LIFE ASSURANCE CO. OF CANADA J. D. ABBOTT COMPANY J. D. Abbott Company hired all employees, paid all expenses with certain minor exceptions, and maintained the office jointly occupied by it and the petitioner. The number of employees ranged from 10 to 15 in the years involved *129 herein. In addition to Abbott, the office force was made up of an office manager, men in the field who contacted builders for the purpose of getting mortgage business, people who interviewed prospective mortgagors and investigated their credit, an accounting department, and a clerical force which serviced the mortgages. Complete records were maintained by the two corporations daily and currently at all times. The following schedule shows the jointly incurred expenses paid or accrued by J. D. Abbott Company for the years 1952, 1953, and 1954: Classifications:
1952
1953
1954
Salaries
$62,749.69
$65,744.17
$ 77,884.21
Travel and en-
tainment
8,872.44
8,433.00
7,428.68
Rent
6,136.00
5,988.00
6,664.50
Miscellaneous
16,514.03
17,385.02
29,395.39
Totals
$94,272.16
$97,550.19
$121,372.78
The petitioner claimed expense deductions for capital stock tax, real estate tax, servicing supplies, depreciation on servicing bookkeeping machines, and miscellaneous items totaling $3,262.29 for 1952, $2,551.53 for 1953, and $2,082.59 for 1954. J. D. Abbott Company also claimed deductions for commissions, mortgage sales expenses, and capital stock tax. *130 J. D. Abbott Company reported the following receipts during the years 1952, 1953, and 1954: Income Classifications:
1952
1953
1954
Premiums on mortgage sales
$103,213.84
$44,286.39
$ 49,370.73
Less: participations of others in premiums
58,810.29
7,723.64
7,023.65
Less: losses on sales of mortgages
0
0
6,781.18
Net premium receipts
$ 44,403.55
$36,562.75
$ 35,565.90
Closing fees
11,729.08
9,153.47
51,581.21
Construction loan fees
3,320.00
5,539.20
6,680.00
Hazard insurance commissions
9,130.18
7,682.87
6,121.01
Appraisal fees
922.75
58.25
0
Miscellaneous income
554.50
0
405.10
Total receipts reported (other than minor
amounts of interest on Gov. bonds and
gains from the sale of capital assets)
$ 70,060.06
$58,996.54
$100,353.22
The petitioner reported the following receipts for the years 1952, 1953, and 1954, in addition to minor items of dividends, interest on Government obligations, and interest received during periods mortgages were being warehoused which were approximately offset by interest paid to banks for warehousing mortgages: Income Classification:
1952
1953
1954
Servicing charges to investors
$79,714.20
$84,622.56
$82,495.78
*131 On the books of the two corporations and in their tax returns a calculation was made for allocating the jointly incurred expenses between J. D. Abbott Company and the petitioner based on their comparative revenues as follows: 1952
J. D. Abbott
The
Company
Petitioner
Revenues for basis of expense allocation
$70,060.06
$79,714.20
Percentages for allocation
46.8%
53.2%
Jointly incurred expenses allocated to each
43,141.25
51,140.91
1953
Revenues for basis of expense allocation
$58,996.54
$84,622.56
Percentages for allocation
41.1%
58.9%
Jointly incurred expenses allocated to each
39,477.52
58,072.67
1954
Revenues for basis of expense allocation
$92,853.22
$85,179.55
Percentages for allocation
52.2%
47.8%
Jointly incurred expenses allocated to each
62,820.78
58,552.00
On the tax returns of the two corporations the jointly incurred expenses were allocated and deducted as shown above. The Commissioner, in the statutory notice of deficiency, allocated from the J. D. Abbott Company to the petitioner all of the net premium income reported by J. D. Abbott Company. Joint occupancy expenses were likewise allocated by the *132 Commissioner between the two corporations on the basis of revenues of the two corporations, treating as revenue of the petitioner the said premium income from the sale of mortgages. Certain other adjustments have been settled by stipulation. The books and tax returns of J. D. Abbott Company and the petitioner fairly and clearly reflect the income of each of the two corporations for the periods involved herein, and no allocation of income or deductions from J. D. Abbott Company to the petitioner is necessary in order to clearly reflect the income of the two corporations. In 1945, Abbott individually acquired 14 lots in a large subdivision that had been laid out by a real estate company in Ross Township, Allegheny County, Pennsylvania, and a 5.398-acre tract on Babcock Boulevard, Pittsburgh, Pennsylvania, which had been subdivided into 15 lots. Four of the lots and the 5.398-acre tract were conveyed by Abbott to the petitioner in 1949. Three of the lots and the 5.398-acre tract acquired by the petitioner from Abbott in 1949 were sold by the petitioner in 1953. The following schedule shows the cost, the expenses of sale, and the gain from the sale of these lots: Selling
Expenses
Description
Price
Cost
of Sale
Gain
North Hills Estates Plan No. 2 Lots 268 and 269
$ 6,202.65
$ 3,077.19
$137.75
$2,987.71
Lot No. 271
3,163.46
1,165.18
376.35
1,621.93
5.398 acres - 900feet frontage on Babcock Blvd. (known
as Lots 1-15)
13,030.25
10,500.00
459.30
2,070.95
$22,396.36
$14,742.37
$973.40
$6,680.59
*133 The last lot acquired from Abbott in 1949 was sold by the petitioner in 1954. It was also the remaining lot owned by the petitioner. Its selling price was $3,000, the expenses of sale amounted to $178, and the cost basis of the lot was $1,748. The lots which were sold in 1953 and 1954 were conveyed to the petitioner by Abbott for the purpose of building up the assets of the Abbott Mortgage Company so that it would continue to qualify as an FHA approved mortgagee. They were never in the hands of any broker for sale while the petitioner owned them. The customers who purchased these lots contacted the petitioner. The petitioner had nothing to do with the development of the properties. They were purchased by Abbott as an individual for the purpose of inducing builders to do business with him, but Abbott's plans did not "work out". The gains from the sale of the lots hereinbefore described were reported by the petitioner as long-term capital gains. In the statutory notice of deficiency the Commissioner included these gains as taxable in full. These lots were not held by the petitioner for sale in the ordinary course of its trade or business. Opinion The answer to the question *134 whether or not the Commissioner properly allocated to petitioner from J. D. Abbott Company income from the origination and sale of mortgages in the taxable years depends upon analysis of the factual situation. Advance Machinery Exch. v. Commissioner, (C.A. 2) 196 Fed. (2d) 1006, affirming a Memorandum Decision of this Court [8 TCM 84], certiorari denied 344 U.S. 835. The Commissioner relies upon sections 22(a) and 45, Internal Revenue Code of 1939, as authority for his action with respect to the years 1952 and 1953 and upon sections 61 and 482, Internal Revenue Code of 1954, with respect to the year 1954. Based upon our analysis of the facts as found we hold that the Commissioner erred. As we understand it, the Commissioner's principal contention is that the facts demonstrate that it was petitioner rather than J. D. Abbott Company which earned the mortgage premiums and, accordingly, that this income, after adjustment for a fair share of the deductions attributable thereto, was properly taxable to petitioner rather than to the Abbott Company. We cannot say that this contention possesses no merit. The evidence is not *135 such that a wholly luminous distinction can be drawn between the functions performed by the two wholly owned corporations, dominated and managed as they were by the same individual, housed under the same roof, and utilizing to a greater or lesser extent the same personnel and a somewhat garbled method of carrying on business. Nevertheless, we are of the opinion that the books of the two corporations, (the petitioner and J. D. Abbott Company) fairly represent the income of each and fairly allocate expenses and other deductions between them. No question of sham is raised so far as petitioner is concerned and the Commissioner's proposed allocation of income would still leave petitioner in the position of a recognizable taxpayer. We are convinced by a preponderance of the evidence that petitioner's primary function was the servicing of mortgages and that its income was derived from that source. With the stipulated adjustments, this is fairly reported on its returns. On the other hand, J. D. Abbott Company's income stemmed from mortgage brokerage as previously carried on by the old company and, in the interim, by J. D. Abbott individually. These functions, mortgage servicing and mortgage *136 brokerage, are reasonably separable and we think the modus operandi here resulted in a proper tax result for the two corporations, as contended for by petitioner. On this record, we perceive no reasonable basis on which the Commissioner could make the allocation to petitioner of part of the income of J. D. Abbott Company and in this respect we hold that he erred. Seminole Rock & Sand Co., 19 T.C. 259. Our findings of fact dispose of the issue with respect to the sale of the real estate in favor of petitioner. This realty was first acquired by J. D. Abbott in 1945. At that time it had already been subdivided. In 1949 Abbott transferred four lots and the 5.398-acre tract to petitioner for the purpose described in the findings. Petitioner did not acquire the real estate for sale in the ordinary course of its business. It disposed of the lots in but two transactions. There is not here that extensiveness of dealing or continuity of sales which is generally recognized as putting the taxpayer in the business of selling real estate. We hold for petitioner on this issue. Decision will be entered under Rule 50.