JUSTICE HUNT
dissenting:
¶45 The majority has elevated form over substance in accepting Decker’s contentions. As the DOR ironically frames the question presented: How can this coal be worth the values of $7 to $ 10/ton claimed by Decker and its expert when it is simultaneously sold to Commonwealth for $24 to $29/ton? The plain answer to that question is that it can only be attributed the lesser value, as the majority has done here, by ignoring the economic realities of the transactions at issue. I dissent because I agree with the DOR that artificial prices between companies that share common management and ownership do not accurately reflect the true value of coal upon which coal production taxes are based. Rather, the best indicator of value for Montana coal production tax purposes is the actual prices paid for the coal in question, as determined by the long-term contracts underlying the transactions. As discussed below, I conclude that the DOR has satisfied both prongs of the conjunctive test for imputing a taxable value to coal sales and, therefore, that the DOR’s assessments should be affirmed.

1. The Montana Contracts Were Not Arms-Length Transactions

¶46 The majority does not address whether the Montana Contracts were arms-length transactions. It is crucial to address this prong, however, because the DOR’s imputed value follows entirely from this starting premise. As defined by Judge Baugh, an “arms-length” transaction is an agreement (1) between independent (2) non-controlled parties (3) with opposing economic interests. Looking at the record as a whole, it is clear that the Montana Contracts were not arms-length. Being non-arms-length, the contract prices paid to Decker by Big Horn and Black Butte simply were not representative of “market value” as contemplated by Montana law.
*491 ¶47 First, the Kiewit Companies were not independent of one another. Kiewit owned all or part of Decker, Big Horn, and Black Butte. Decker claims that notwithstanding Kiewit’s ownership interests in all three subsidiary companies, the Montana Contracts were arms-length by virtue of the fact that the agreements were negotiated by a representative of Kiewit on behalf of Big Horn and Black Butte and by a representative of NERCO on behalf of Decker. However, as the Department argues and as STAB found, such “negotiation” is insufficient to render the Montana Contracts arms-length, since the respective “negotiators” were shown to both be members of the Decker Management Committee. In other words, a member of the Decker Management Committee “negotiated” with another member of the Decker Management Committee to sell Decker coal. These “negotiations” were nothing more than Decker negotiating with itself for the sale of Decker coal with Decker approving what was “negotiated.”
¶48 Second, the Kiewit Companies were jointly controlled. Not only is Kiewit’s overlapping ownership of all three subsidiary entities strongly indicative of control, see Creme Mfg. Co. v. United States (5th Cir. 1974), 492 F.2d 515, 520, but the record shows that Kiewit controlled the day-to-day management and operational responsibilities of Decker, Big Horn, and Black Butte. Additionally, Kiewit filed a combined Montana Corporation License Tax return for all three subsidiary entities indicating that they were engaged in a unitary business. See Allied-Signal, Inc. v. Director, Div. of Taxation (1992), 504 U.S. 768, 781, 112 S.Ct. 2251, 2260, 119 L.Ed.2d 533, 548 (indicating that objective indicia of a “unitary business” are (1) functional integration, (2) centralization of management, and (3) economies of scale). Kiewit’s filing of a unitary tax return is, by itself, an admission that Decker, Big Horn, and Black Butte were jointly controlled.
¶49 Third, the Kiewit Companies did not have opposing economic interests. Although Decker claims that NERCO’s participation in the negotiation of the Montana Contracts ensured that Decker received the highest price for its coal, this fact does not magically render the transactions the result of opposing economic interests. It is too simple a point to belabor here, but all of the parties to the Montana Contracts, including NERCO, had the same economic interest of selling more Decker coal. Put simply, everyone stood to profit by the Montana Contracts. This was especially true of Kiewit: not only would ComEd pay Kiewit under the lucrative long-term Big Horn and Black Butte contracts without diminution by the Wyoming coal severance tax, but *492 Kiewit would also be paid for the additional Decker coal that was mined with Decker, as it turns out, being taxed only on the lower face value of the Montana Contracts.

2. The Value Imputed to the Montana Contracts Was Market Value

¶50 As the DOR discovered in auditing Decker, the obligations of Big Horn and Black Butte to purchase Decker coal under the Montana Contracts were totally contingent upon two things: first, Big Horn and Black Butte had no right to purchase Decker coal under the Montana Contracts until Decker had satisfied its monthly delivery obligations to ComEd pursuant to the 1974 contract; and second, Big Horn and Black Butte had no obligation to purchase Decker coal under the Montana Contracts unless ComEd was purchasing coal pursuant to the Wyoming Contracts.
¶51 In other words, the Montana Contracts were clearly ancillary to and contingent upon the preexisting long-term contracts. While the Montana Contracts were not arms-length, it is undisputed that the 1970s long-term contracts between ComEd and the Kiewit Companies were arms-length agreements negotiated between a willing buyer and seller. Therefore, nothing should prevent the DOR from piercing the sham Montana Contracts and reaching the true value of the underlying, arms-length transactions.
¶52 The DOR is permitted to impute a value to coal when a party (1) sells coal under a contract which is not an arms-length agreement, and (2) the contract price is below market value. See §§ 42.25.512 (l)(b) and 42.25.1708 (l)(b), ARM. Here, having determined that the Montana Contracts were not arms-length agreements, the DOR then correctly determined that the sham contract prices were below “market value” as determined by the price provisions of the underlying long-term contracts at the time of sale.
¶53 The DOR satisfied all three requirements implicit in Judge Baugh’s definition of market value: (1) that the price a “willing buyer” (ComEd) would pay a “willing seller” (Kiewit) was $24-$28/ton; (2) that the “market and economic conditions” for the Decker coal at issue were defined by the 1970s long-term contracts between the Kiewit Companies and ComEd; and (3) that the price provisions (base price + escalators) of the long-term contracts determined the price “at the time of sale” for Decker coal sold to ComEd during the 1980s.
¶54 First, the DOR’s imputed value of $24-$28/ton was equivalent to the actual prices paid for Decker coal by ComEd under arms-length *493 agreements. In implementing its broad authority under § 15-35-107(3), MCA, the DOR did not, contrary to Decker’s suggestions, rely solely on the 1974 long-term contract between Decker and ComEd as the basis for its imputation. While the DOR did initially look to that contract in defining the relevant market value for Decker coal, which it is entirely justified in doing under 26 U.S.C. § 613 and 26 C.F.R. § 1.1613-4, the DOR went further and compared the value of Decker coal sold under the 1974 contract with the value of Decker coal sold under the Wyoming Contracts to verify the accuracy of its imputed value.
¶55 This inquiry showed that Decker, Big Horn, and Black Butte were each selling Decker coal to ComEd during the audit period at substantially similar prices as determined by the arms-length long-term contracts: Decker was receiving $26.79 to $28.04/ton under its 1974 contract, while Big Horn and Black Butte were receiving $23.71 to $29.47/ton under the 1976 Wyoming Contracts. Therefore, the DOR’s imputed value of approximately $24-28/ton was obviously based on the prices paid to the Kiewit Companies by ComEd under all three long-term contracts, not just the 1974 Decker/ComEd contract. This methodology was. an entirely appropriate use of the DOR’s authority, under § 15-35-107, MCA, to utilize “other criteria” in arriving at an imputed value. See § 15-35-107(3), MCA (specifying that the DOR may utilize the factors enumerated in 26 U.S.C. § 613 or “may apply any other or additional criteria it considers appropriate”).
¶56 Given that the DOR’s imputed value of $24-$28/ton represents the actual prices paid by ComEd during the audit period for the Decker coal at issue, Decker cannot refute the DOR’s imputation. Decker has simply failed to sustain its burden of proving that the imputed value for the coal at issue does not approximate market value. See § 15-35-107(3), MCA. Since the underlying long-term contracts were arms-length, those contract prices therefore represent the amounts a willing buyer would pay a willing seller for the Decker coal at issue.
¶57 Second, the 1970s contracts defined the “market and economic conditions” for the sale of Decker coal during the audit period. Decker contends, and the majority accepts, that coal is an entirely fungible substance. The majority goes awry by assuming, erroneously, that there is a single market value for coal and, consequently, that the value of long-term coal contracts negotiated under markedly different market conditions can be judged according to current market con *494 ditions for coal contracting. Not only does this position fail to acknowledge the public policy underlying Montana’s coal severance tax, but it leads to an absurd legal result.
¶58 As the DOR suggests, the primary legislative purpose underlying Montana’s coal severance tax was to establish “categories of taxation which recognize the unique character of coal as well as the variations found within the coal industry.'' Section 15-35-101(2)(d), MCA (emphasis added). In enacting the coal severance tax, the Montana Legislature found that “while coal is extracted from the earth like metal minerals, there are differences between coal and metal minerals” justifying different treatment for taxation purposes. Section 15-35-101(1), MCA. These differences, as expressly found by the legislature, include the fact that “coal is the only mineral which is so often marketed through sales contracts of many years’ duration” (§ 15-35-101( l)(b), MCA); that “coal, unlike most minerals, varies widely in composition and consequent value when marketed” (§ 15-35-101(l)(c), MCA); and that different types of coal “in Montana have sufficiently different markets and value and therefore require different production taxes” (§ 15-35-101(l)(e), MCA) (emphases added).
¶59 As a general rule, the public policy of this state is set by the Montana Legislature through its enactment of statutes. Duck Inn, Inc. v. Montana State Univ. (1997), 285 Mont. 519, 523-24, 949 P.2d 1179, 1182. The public policy underlying Montana’s coal severance tax recognizes the unique character of coal as a mineral substance, the different markets and values which exist for different types of coal, and the prevalence of long-term contracting in the coal industry as a means of ensuring a coal supply of a particular grade or quality. If the Montana Legislature has expressly recognized variations in coal quality and consequent value, and the prevalence of long-term contracting in the coal industry because of these variations, nothing should prevent the DOR from recognizing the same and imputing a value to a long-term contract based upon actual sales prices where, as here, that contract specifies coal of a particular quality and provides for a price at the time of sale.
¶60 Decker’s sale and delivery of coal was, by the very terms of the Montana Contracts, contingent upon Black Butte and Big Horn being able to “contemporaneously sell and deliver” an identical quantity of Decker coal to ComEd pursuant to the Wyoming Contracts; and that coal had to be of a specific quality under the terms of the Montana *495 Contracts (contractually specified BTU, ash fusion temperatures, and specific percentages of moisture, volatile matter, fixed carbon, ash, sulphur, and sodium), which identically parallel the highly specific coal quality provisions of the 1974 Decker/ComEd contract. Although the Wyoming Contracts themselves are not in the record, they presumably contain the identical coal quality provisions. Indeed, the Johnson Report suggests that one of the reasons for the Montana Contracts was because Big Horn and Black Butte were having trouble supplying coal of the particular quality mandated by the Wyoming Contracts at a reasonable extraction cost.
¶61 Notably, Decker cites no sales of Decker coal (by Decker, Big Horn, or Black Butte) during the audit period other than the sham sales made to its companion Kiewit companies under the Montana Contracts. Decker’s hypothetical argument that it could have sold its coal to other willing buyers under market conditions in the 1980s begs the question: What reasonable coal company would undercut its profit potential by selling on the open market when it could enter into an intra corporation sale which is tied to preexisting long-term contracts with higher prices? Put simply, it strains good faith to assume that Decker would be a “willing seller” on the open market when it already had a “willing buyer” in ComEd who would pay significantly higher prices than dictated by existing market conditions. The District Court was correct in determining that this was, in effect, a “closed market” situation.
¶62 In that respect, the Sansrom Report, upon which the majority relies, is simply irrelevant. The Sansrom Report is a description of the 1980s market for sp6t contracts and new long-term contracts, however, it cites no sales of Decker coal during the audit period. In essence, what Decker is arguing by relying on the Sansrom Report is that evidence of other 1980s prices for coal not mined from Decker and not sold to ComEd provides better evidence of the value of the Decker coal at issue than the actual value of Decker coal sold to ComEd during the audit period. This is an absurd position.
¶63 Contrary to the majority’s reasoning, judging sales of Decker coal under the Montana Contracts by sales of coal of other quality and value suffers, as the DOR justifiably asserts, from an “apples-to-oranges” comparison. The Johnson Report clearly articulated that, “coal is not a homogeneous commodity” since it “varies greatly in terms of its BTU content and other physical properties, and power plants are designed to burn certain types of coal." Remember that the *496 value of coal, unlike other minerals, varies dependent upon its composition. Section 15-35-101(l)(c), MCA. Therefore, as compelled by the federal Clean Air Act, a major factor underlying the prevalence of long-term contracting between a utility company like ComEd and a low-sulphur western mine like Decker is, in fact, the heterogeneous nature of coal. The majority’s simplistic analysis on the basis of the Sansrom Report is fallacious because, as the Johnson Report stated, it “completely ignores the economic rationale for long-term contracts between coal suppliers and utilities, a dominant feature of the coal market, especially in the Western United States during the 1970s and 1980s.”
¶64 Furthermore, the apparent “illogic” of the DOR’s position, as suggested by Decker and accepted by the majority, is an obvious red herring. The inverse situation would never arise. Keep in mind that the underlying long-term contracts here were arms-length and that the DOR’s imputation flows from the fact that the surface Montana Contracts were not arms-length. Therefore, assuming that the long-term contract is an arms-length agreement, as here, the DOR would never be in a position to impute a different value to that contract under the conjunctive test for approximating market value. Without any evidence that the agreement was non-arms-length, the contract sales price would be determinative of the taxable value of that coal even if the contract price were significantly below current market value. See §§ 15-35-102(7), 15-35-103(2), and 15-35-107(l)(c), MCA. However, where, as here, the contract price is non-arms-length and totally contingent upon contemporaneous sales of the same coal under a lucrative long-term contract, the DOR should be entitled to pierce the sham contract price and tax the true value of the underlying transaction.
¶65 Third, the long-term contracts specify a contemporary sales price according to a base price and predetermined escalators which are calculated “at the time of sale.” That these contracts were not designed to closely follow changes in the price of spot market and new long-term contracts is immaterial unless one ignores coal’s variability in composition and market value, and the economic rationale for long-term coal contracts. Pursuant to the price provisions of the underlying long-term Decker/ComEd contract, the base price together with the price adjustments under the predetermined escalators constitute the “ ‘current price’ or ‘current per ton price.’ ” If that were not sufficient evidence that the underlying long-term contracts contain a *497 temporal dimension sufficient to satisfy the definition of market value, Kiewit itself represented to the United States Securities and Exchange Commission that “[tjhe price at which coal is sold under the Company’s long-term contracts is determined at or near the time of sale ....” Plainly, the time of “sale” occurred during the 1980s when Decker coal was loaded on the train f.o.b. at the Decker mine for delivery to ComEd, not in the 1970s when the long-term contracts were entered into.
¶66 Given the legislative findings on the purpose of taxing coal differently from other minerals (i.e., because of variations in coal quality, value, and markets) and the DOR’s broad authority in imputing value, nothing under Montana law prohibits the DOR from recognizing that long-term contracts strictly specifying coal of a particular quality and providing for a contract price determined at the time of sale, such as here, are directly representative of the relevant market value for that particular coal. Indeed, the DOR’s assessments not only approximate market value; they constitute market value. I would affirm because there is no better approximation of market value than the actual prices paid for the coal at issue.

Concluding Remarks

¶67 The law is supposed to respect substance above form. Section 1-3-219, MCA. After today, however, other vertically integrated mining companies that hold lucrative long-term coal contracts and do business in Montana now possess, thanks to Kiewit’s ingenious legal shell game and the majority’s formalistic holding, a paradigm for avoiding being taxed on the true value of their long-term contracts. By simply arranging for a sham spot market or new long-term coal contract between subsidiaries at prices slightly above current market value, a parent company, like Kiewit, can reap massive profits on underlying long-term coal contracts while paying relatively minimal taxes on the mock value of the surface contract. Provided that such a transaction is structured to be at least equivalent to current market value for spot market and new long-term coal contracts, the transaction will only be taxable at the contract sales price regardless of whether the agreement was non-arms-length.
¶68 In short, the majority has accepted Decker’s following argument, and its absurd consequences, lock-stock-and-smoking-barrel: “[TheJ ownership interests of Kiewit potentially affects only whether the Montana Contracts were arm’s length agreements. Even if these agreements are determined not to be arm’s length agreements, *498 Montana law does not allow the Department to impute a price above the market price for coal.” The majority, by treating coal as an entirely fungible substance with a single market value, has effectively-reduced the two-pronged test for approximating market value to a single inquiry: Does the new contract price, irrespective of whether it is tied to existing long-term contracts with substantially higher prices, match or exceed current market value for other new contracts? If so, then the DOR cannot impute a different value to that contract, even where, as here, the contract price is plainly the product of a sham, intracorporation transaction. I dissent; today’s absurd decision dupes the State of Montana and its citizens out of over $50 million in rightful tax revenues and that may be only the beginning.
JUSTICE TRIEWEILER concurs in the foregoing dissent.